IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

LANIER SCOTT,

                    Plaintiff,                    OPINION AND ORDER

    v.

                                                      15-cv-422-wmc

NANCY BERRYHILL, Acting Commissioner
of Social Security,

                    Defendant.

---

Pursuant to 42 U.S.C. § 405(g), plaintiff Lanier Scott seeks judicial review of a final decision of defendant Nancy Berryhill, the Acting Commissioner of Social Security, which denied his application for Social Security Disability Insurance Benefits and Supplemental Security Income. On December 19, 2016, the court heard oral argument on plaintiff's related contentions that the ALJ erred by failing to give proper weight to Scott's treating physician, Dr. Tecarro. For the reasons provided below, the court agrees and will remand this matter for further administrative proceedings consistent with this opinion.

BACKGROUND

**A. Overview of Claimant**

Scott was 42 years old at the time of his alleged onset date, June 1, 2011; 43 at the time he applied for benefits on March 29, 2012; and 44 at the time of the hearing before an ALJ on October 23, 2013. Scott has at least an eleventh-grade high school education, is able to communicate in English, and has past work experience as a cable repairer, cable installer, press operator, forklift operator, groundskeeper, and grinder (of parts used in automobile manufacturing). At his hearing, Scott testified that he last

worked in 2011 as a press operator for a truck driver, but was fired because he could not perform his job duties, which included lifting 100 pounds. He claims that this was due to his disability -- cervical spine disorder, chronic thrombocytopenia[1] and leukopenia.[2]

**B. Medical Record**

Scott's medical records contain notes from Mark Moore, M.D., an occupational medicine doctor, during the spring and summer of 2011, which supported Scott's claim for Worker's Compensation. One of Dr. Moore's notes made in April 2011 identifies June 5, 2010, as the date of Scott's injury. At that time, Scott was prescribed Gabapentin to treat nerve pain, and reported that it was helping, but that he experienced tiredness and dizziness as side effects. Still, Scott was still working, able to operate a forklift during this period. He also elected *not* to pursue cervical nerve root injection or vascular surgery consult. (AR 242.) Dr. Moore then referred him for an Functional Capacity Evaluation ("FCE"), which was completed on May 5, 2011, and limited Scott to medium to light work. (AR 370-377.)

Dr. Moore saw Scott again on May 25, 2011, reviewed the FCE, and noted that Scott continued with drowsiness issues, resulting in him being taken off of forklift driving at work. He also reported continued pain in his neck and arm. "Despite great pushing" by Dr. Moore, Scott continued to refuse epidural steroid injections and vascular surgery

---

[1] "Thrombocytopenia is a condition in which you have a low blood platelet count. Platelets (thrombocytes) are colorless blood cells that help blood clot. Platelets stop bleeding by clumping and forming plugs in blood vessel injuries." "Thrombocytopenia," Mayo Clinic, http://www.mayoclinic.org/diseases-conditions/thrombocytopenia/basics/definition/con-20027170.

[2] "A low white blood cell count (leukopenia) is a decrease in disease-fighting cells (leukocytes) in your blood. Leukopenia is almost always related to a decrease in a certain type of white blood cell (neutrophil)." "Low white blood cell count," Mayo Clinic, http://www.mayoclinic.org/symptoms/low-white-blood-cell-count/basics/definition/sym-20050615.

options.  At that point, Moore declared an "end of healing," and no further appointments were scheduled.  (AR 243.)

Moore saw Scott again in July 2011, because Scott wanted a change in his work restrictions.  At that time, he reported "trouble with neck pain while reading or even going to a movie and sitting for 3 hours.  If he reads over 15 minutes, works on a computer over 15 to 25 minutes, he has increased pain."  Scott also questioned whether his lift restriction should be 10-pounds (rather than 20 to 30 pounds on a rare basis, 6 to 10 pounds on a frequent basis).  Dr. Moore warned that if Scott added more restrictions, his employer may feel that the essential functions of the job are not being met.  Moore also said that he would have to return to an occupational therapist to have his FCE changed, and he encouraged Scott to go back to Dr. Leonard for consideration of injections or surgery.  (AR 245.)

Central to Scott's challenge, the medical record also contains extensive notes by Scott's primary care physician, Christel Tecarro, M.D., which date from June 2011 through May 2013.  A June 28, 2011, note describes Scott's injury, his decision to pursue conservative treatment with physical therapies and medications, "but in spite of doing that the pain has pretty much been persistent." Tecarro also noted that X-rays did not show any dislocation, and that an MRI "did not show any changes of the bone marrow or spinal cord, no soft tissue mass, no central foraminal narrowing."[3]  A physical exam, however, did confirm that:  Scott's "[n]eck is kind of stiff with some paravertebral muscle spasms;" he has "limited range of motion with neck extension, flexion, and lateral

---

[3] A foramen is an opening between two spinal vertebrae.  *See* "Intervertebral foramina," Wikipedia, https://en.wikipedia.org/wiki/Intervertebral_foramina.

rotation"; and he "continued to present with signs and symptoms of cervical radiculopathy which was quite hard for them to pinpoint." Scott refused epidural block treatment, but given that he had lost his job due to the pain, Tecarro increased his pain medication since he is no longer working and therefore does not need to be alert. Tecarro also offered a referral to a pain management clinic. (AR 254-55.)

Dr. Tecarro's July and September 2011 notes similarly reveal Scott's "worsening pain [in] the neck radiating into left shoulder and even into the left arm," and that the "range of motion on the left arm is significantly diminished," though Tecarro noted no numbness and Scott still had not decided whether to go to a pain management clinic. Tecarro then ordered a new MRI and added a new pain medication. (AR 260-63.) Once again in December 2011, Scott complained to Tecarro of continued pain, though he also indicated that it was a "little bit controlled" with Vicodin at night and tramadol during the daytime. He further denied any weakness or numbness. (AR 267-69.)

The second MRI was completed in February 2012, and it showed actual "disc protrusion more [t]owards the left on C5 and C6 and C6 [and] C7 with cord displacement noted." (AR 272.) Scott was then referred to Froedtert for neurosurgical consult, though, as noted below, the consultation appears to never have happened because of insurance issues.

In May 2012, Scott was again seen by Dr. Tecarro to follow-up on his chronic neck pain. The notes indicate that: the pain now radiates to his left hand; "associated symptoms include crepitus, difficulty initiating sleep, joint clicking, joint locking, joint stiffness, limited joint motion, muscle stiffness, nocturnal awakening, nocturnal pain, numbness, tenderness, tingling and weakness." Tecarro also indicates that insurance

4

denied the referral to the pain clinic at Froedtert, and indicated a plan to refer to pain management or neurosurgery. (AR 278.)

Around that same time, Dr. Tecarro completed two disability questionnaires. In the first, he indicated that Scott: could sit, stand and work less than 1 hour in 8-hour work day; cannot do any walking or standing for more than 30 minutes; is restricted on reaching, handling and fingering; can't use feet in operating foot controls; is limited to lifting or carrying no more than 10 pounds occasionally; and adds other restrictions on movement and activities. (AR 290-93.) In the second questionnaire, Tecarro described similar, albeit less restrictive limitations: lifting less than 10 pounds; can sit less than 2 hours sitting during an 8-hour workday; needs to move around frequently; is restricted on activities; notes reaching, handling, fingering, feeling, pushing/pulling all impacted by impairments; should avoid moderate exposure to cold, humidity, gasses, etc.; and further notes that impairments would cause more than four absences per month. (AR 323-25.)[4]

Dr. Teccaro's November 2012 and May 2013 notes indicate Scott's continued refusal to try epidural blocks for treatment, indicating that he wants to be treated conservatively with pain medication, and specifically noting concern based on his wife's experience. The May 2013 note further indicates that Scott "cannot lift or carry anything without his neck hurting," has difficulty reading because bending forward is hard for him to do," and has "not been able to drive for a long time." (AR 297, 331-41.)

Two state agency physicians also reviewed Scott's medical record. Dr. Chan, in a report dated June 27, 2012, discounted Scott's credibility because of inconsistencies in

---

[4] Dr. Tecarro also completed a depression and anxiety questionnaire (AR 326-28), but Scott does not contend that the ALJ erred in failing to consider whether he suffers from a psychological impairment, and it's also not clear why Tecarro completed this form.

file, including that Scott "reported [he] could not cut grass via mower, but ME indicated clmt was . . . able to do forklift work despite neck and lt hand pain and had to stop this work d/t sleepiness r/t gabapentin medication and not d/t neck and lt arm pain." (AR 77.) Even so, Chan's RFC limited Scott to "lifting, carrying, etc. 10 pounds; can stand and/or walk up to 2 hours per day and can sit for up to 6 hours in 8-hour day; unlimited pushing and /or pulling; neck pain limits him to sedentary work; no other limitations (including manipulative)." (AR 78-80.) Indeed, in a January 1, 2013, report, Dr. Shaw appears to agree with Dr. Chan, and further notes Scott's refusal to do epidural blocks, and that there were "no objective neuro findings on exam in 5/12." (AR 85-89.)

**C. ALJ's Decision**

The ALJ held a hearing on October 23, 2013, and issued an opinion dated February 27, 2014, ruling that Scott was not disabled. (AR 12.) The ALJ found two severe impairments -- cervical spine disorder and chronic thrombocytopenia / leukopenia -- but found neither impairment nor the combination of these impairments meets or medically equals the severity of one of the listed impairments. Part of this determination rested on the ALJ discounting Scott's complaints about numbness limiting his fingering and manipulating given the lack of "objective evidence in the record confirming an inability to effectively perform fine and gross manipulations with the upper extremities." (AR 14.) The ALJ specifically noted the lack of an EMG study.[5] (*Id.*)

---

[5] "Electromyography (EMG) measures muscle response or electrical activity in response to a nerve's stimulation of the muscle. The test is used to help detect neuromuscular abnormalities." "Electromyography (EMG)," Johns Hopkins Health Library, http://www.hopkinsmedicine.org/healthlibrary/test_procedures/neurological/electromyography_emg_92,p07656/.

At step 5, the ALJ further concluded that "the claimant's statements concerning the intensity, persistence, and limiting effects of these symptoms are not fully credible to the extent they are inconsistent with the objective medical evidence." (AR 15.) The ALJ provided a rambling list of reasons for this conclusion, including:

- o Scott's continued refusal to undergo epidural cervical nerve root injections or see a vascular surgeon for consultation. (AR 15-16.)

- o While Dr. Moore's May 2011 FCE limited his work to light to medium work; treatment notes show drowsiness caused by Gabapentin as reason for Scott not being able to operate the forklift, not exertional limitations. (*Id.*)[6]

- o Dr. Tecarro's September 2011 treatment note found no focal weakness or numbness on examination, but a diminished range of motion. (AR 16.)

- o No EMG study was performed to confirm nerve involvement. (AR 16.)

- o Tecarro's treatment note, which the ALJ describes as "show[ing] that the claimant's condition had improved, as he had normal range of motion and strength in the musculoskeletal examination." (AR 16 (citing Exhibit 11F, 3.)

- o Some medical records show "that medication were effective in reducing pain and that Scott was satisfied with this conservative treatment." (AR 17.)

- o "MRI of the cervical spine did not show any changes to the bone marrow or spinal cord and no soft tissue mass or central foraminal narrowing." (*Id.*)

Ultimately, the ALJ's own RFC limited him to sedentary work, which would accommodate any fatigue, limit his sitting, standing or walking, and further limited him to 10 pounds of listing occasionally. (AR 17.) Material to plaintiff's challenge, the ALJ placed little weight on Dr. Tecarro's opinions because they are "not substantiated by the

---

[6] Although the ALJ did not consider whether the side effects from medication contributed to Scott's claim for disability, plaintiff does not challenge this aspect of the ALJ's decision. *See* SSR 86-7p (requiring the ALJ to consider "the type, dosage, effectiveness, and side effects of any medications the individual takes or has taken to alleviate pain and other symptoms").

objective medical evidence, which are Dr. Tecarro's own treatment notes." (AR 18.) Instead, the ALJ placed great weight on the state agency's physical assessments because "they incorporate the claimant's neck impairment without overstating the claimant's limitations." (*Id.*)

Finally, the ALJ found Scott is unable to perform any past relevant work, but could perform jobs of solicitor, inspector and telephone quotation clerk. (AR 18-19.)

OPINION

Plaintiff contends that the ALJ erred by failing to sufficiently weigh the opinion of his treating physician Dr. Tecarro. The standard is a familiar one. On judicial review, a court will uphold the Commissioner's decision if the ALJ applied the correct legal standards and supported his decision with substantial evidence. 42 U.S.C. § 405(g); *Jelinek v. Astrue*, 662 F.3d 805, 811 (7th Cir. 2011). Crucial to review in this case, an ALJ is required to assign a treating source physician's opinion controlling weight, provided the opinion is supported by "medically acceptable clinical and laboratory diagnostic techniques[,]" and is "not inconsistent" with substantial evidence in the record. *Schaff v. Astrue*, 602 F.3d 869, 875 (7th Cir. 2010); *Jelinek*, 662 F.3d 805, 811 (7th Cir. 2011); 20 C.F.R. § 404.1527(c)(2). When an ALJ does not give a treating source controlling weight, the ALJ must consider the type, length and nature of the relationship, frequency of examination, specialty, tests performed, and consistency and supportability of the opinion. *Scott v. Astrue*, 647 F.3d 734, 739 (7th Cir. 2011); 20 C.F.R. § 404.1527(d)(2). Finally, an ALJ who rejects a treating source opinion must provide a sound explanation for doing so. *Jelinek*, 662 F.3d at 811.

As detailed above, the ALJ provided a somewhat disjointed group of reasons for discounting Dr. Tecarro's opinion, which the court has organized into three core reasons. *First*, the ALJ discounted Tecarro's opinion because of Scott's refusal to try epidural injections and seek a surgical consultation. The ALJ apparently reasoned -- though it is not entirely clear -- that Scott's refusal to seek more aggressive treatment suggests that his pain was not as bad as he reported. The problem, however, is Scott provided a reason for not wanting to pursue more aggressive treatment -- his wife apparently tried epidural shots with poor success. While the ALJ inquired about a missed surgical consultation, Scott simply responded that he could not recall why he missed it. There is also evidence in the record that insurance denied a consultation to Froedtert.

In determining whether a failure to seek more aggressive treatment actually supports a finding that the claimant's reports of pain are exaggerated, however, an ALJ *must* consider the explanation for pursuing only conservative treatments. *See Hill v. Colvin*, 807 F.3d 862, 868 (7th Cir. 2015) (reversing denial of benefits where "the ALJ ignored explanations for the conservative treatment: Hill testified that her doctor was worried about the addictiveness of narcotic pain relievers and that her back and neck pain may have been related to her shoulder and hip pain, which she did complain about to doctors on multiple occasions") (citing SSR 96–7P, 1996 WL 374186, at *7 (ALJs must consider "any explanations that the individual may provide, or other information in the case record, that may explain infrequent or irregular medical visits or failure to seek medical treatment")); *Beardsley v. Colvin*, 758 F.3d 834, 840 (7th Cir. 2014) (remanding to agency where ALJ made no attempt to determine reason for conservative treatment).

9

Here, the ALJ failed to explore sufficiently Scott's reasons for refusing more aggressive treatment options.

*Second*, the ALJ relied on treatment notes indicating that: (1) the pain was managed with medication; and (2) Scott did not complain of weakness or numbness. While there are some isolated references to Scott's pain being controlled or notes about him not complaining about weakness or numbness, primarily in 2011, Dr. Tecarro's regular treatment notes, covering a two year period of time, consistently noted chronic pain. The ALJ failed to consider the record as a whole, instead cherry-picking isolated notes, divorced from a particular medical record, or at least Tecarro's treatment of Scott as a whole. *See Myles v. Astrue*, 582 F.3d 672, 678 (7th Cir. 2009) ("An ALJ may not selectively consider medical reports, especially those of treating physicians, but must consider all relevant evidence. It is not enough for the ALJ to address mere portions of a doctor's report.") (internal quotation marks and citations omitted); *Murphy v. Astrue*, 496 F.3d 630, 634 (7th Cir. 2007) (same).

In particular, the ALJ cited to Exhibits 3 and 11F in support of his contention that Dr. Tecarro's notes "show[ed] . . . the claimant's condition had improved, as he had normal range of motion and strength in the musculoskeletal examination." Since there is no Exhibit 3, the court assumes the ALJ meant Exhibit 3F, which is Dr. Tecarro's May 29, 2012, disability questionnaire described above, but that mentions chronic neck pain, radiating to the left hand, with associated symptoms including "numbness, tenderness, tingling and weakness," among other symptoms. (AR 290-93.) As for Exhibit 11F, which is a 21-page medical record covering more than just Tecarro's care, and there is *no* mention of Scott's condition having improved. (AR 329-49.) Finally, while Tecarro's

May 28, 2013, physical examination note mentioned "Musculoskeletal: Normal range of motion, Normal strength" (AR 333), the same records describe "chronic neck pain," ongoing limitations with "turning neck and neck movement," and the result of the most recent MRI. (AR 331.) All of this is to say that the ALJ's review of Tecarro's medical notes is, at best, incomplete *and* insufficient to provide a basis for limiting the weight of his opinion as a treating physician.

*Third*, the ALJ concluded that Dr. Tecarro's opinion on Scott's limitations was not supported by objective evidence, but, other than an EMG study, it is not clear what additional objective evidence the ALJ sought. Indeed, the *objective* evidence in the record -- the 2012 MRI -- actually showed "disc protrusion more [t]owards the left on C5 and C6 and C6 C7 with cord displacement." The ALJ does not explain why this objective evidence is inconsistent with Scott's complaints of pain or Dr. Tecarro's crediting of Scott's complaints of pain. Instead, the ALJ cited to an earlier 2011 MIR which "did not appear to show any changes to the bone marrow or spinal cord, no soft tissue mass, no central foraminal narrowing."

Even assuming the ALJ appropriately relied on the earlier MRI, he failed to explain why the *lack* of these elements discredits Scott's complaints of pain -- especially given the showing of disc protrusion in the more recent MRI. *See Tyson v. Astrue*, No. 08-cv-383-bbc, 2009 WL 772880, at *10 (W.D. Wis. Mar. 20, 2009) ("Although it is true that a claimant's self-reported symptoms are insufficient by themselves to establish disability, see 20 C.F.R. § 404.1528(a), when these symptoms are documented by a physician in a clinical setting, they 'are, in fact, medical signs . . .,' and are often the only means available to prove their existence.").

ORDER

Accordingly, IT IS ORDERED that the decision of defendant Carolyn W. Colvin, Commissioner of Social Security, denying plaintiff Lanier Scott's application for disability benefits is REVERSED AND REMANDED under sentence four of 42 U.S.C. § 405(g) for further proceedings consistent with this opinion. The clerk of court is directed to enter judgment for plaintiff and close this case.

Entered this 30th day of May, 2017.

BY THE COURT:

/s/

_____
WILLIAM M. CONLEY
District Judge